1
2
3
4
5
6
7

*__E-FILED - 10/13/09__*

8
9
10
11

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHNNY L. SMALL,                        )          No. C 07-5133 RMW (PR)
                                        )
               Petitioner,              )          ORDER DENYING PETITION
                                        )          FOR WRIT OF HABEAS
     vs.                                )          CORPUS, DENYING
                                        )          REQUESTS FOR
M.S. EVANS,                             )          APPOINTMENT OF COUNSEL,
                                        )          AND GRANTING
               Respondent.              )          CERTIFICATE OF
                                        )          APPEALABILITY
_____ )

        Petitioner, a state prisoner proceeding *pro se*, filed a petition for writ of habeas

corpus pursuant to 28 U.S.C. § 2254.  Respondent has filed an answer to the order to

show cause why the habeas corpus petition should not be granted.  Petitioner filed a

traverse.  After reviewing the papers, the court concludes that petitioner is not entitled to

habeas corpus relief based on the claims presented and DENIES the petition.

                            **STATEMENT OF THE CASE**

        An information was filed in Santa Clara County Superior Court on October 29,

2001, accusing petitioner of forcible rape, forcible oral copulation, lewd and lascivious

act on a child under the age of 14, during which petitioner had substantial sexual contact

with the victim, oral copulation with a minor under the age of 16, sexual penetration of a

person under the age of 16 by a defendant over 21, a lewd or lascivious act on a child under the age of 14 or 15, charging enhancement (as to the lewd or lascivious act on a child under the age of 14, during which petitioner had substantial sexual contact with the victim), and two prior prison terms.  On February 21, 2002, count alleging sexual penetration of a person under the age of 16 by a defendant over 21 was stricken on the prosecutor's motion.  On February 22, 2002, a jury found petitioner guilty on all counts, but found the special allegation untrue.  Petitioner admitted the prior strike conviction in exchange for the striking of the two prior prison term allegations.  On July 29, 2002, petitioner was sentenced to 18 years and 8 months and a consecutive, indeterminate term of 60 years to life.  Petitioner immediately appealed his conviction to the California Court of Appeal which affirmed the judgment in a reasoned opinion on December 30, 2003.  On March 17, 2004, the California Supreme Court denied a petition for review.

Having exhausted his direct appeals, petitioner filed a habeas petition in the Santa Clara Superior Court, which denied it in a reasoned opinion.  Petitioner then filed his habeas petitions in the Court of Appeal and the California Supreme Court, which summarily denied them.

A petition for a writ of habeas corpus was filed before the Honorable Martin J. Jenkins on October 5, 2007. An amended petition was filed on November 26, 2007.  The court concluded that the amended petition, when liberally construed, stated a cognizable claim for relief under section 2254, and on March 31, 2008, issued an order to show cause why the petition should not be granted.  The case was then reassigned to the undersigned. Respondent filed an answer and supporting memorandum on June 30, 2008.  Petitioner filed a traverse on July 31, 2008.

## FACTUAL BACKGROUND

The state court of appeal found the facts to be as follows:

When 14-year-old P. turned out to be pregnant in June 2001, she gave two accounts of the person who impregnated her.  First she told her mother Monica and the police that a 15-year-old boy named Steven Johnson was the father.  Then, when Steven could not be located, she told the police that it was defendant,

Monica's boyfriend. A week later P. recanted this identification. At trial in February 2002, P. identified Steven as the father. Defendant did not testify at trial. The evidence against defendant included his own admissions to the police and a tape-recorded telephone conversation between defendant and P.

Carl Lewis, an expert, testified about the child sexual abuse accommodation syndrome. He explained that sexually abused children often exhibit several types of behavior. The crime occurs in secrecy and isolation. The offender reinforces the secrecy by warning of adverse consequences. Children are helpless to resist the advances of an adult on whom they depend. They may have an emotional relationship with the offender. Children feel entrapped and learn to accommodate the situation, sometimes by detaching themselves mentally or pretending to be asleep. Disclosure is often delayed. Retraction may follow disclosure when there are adverse consequences, such as the reaction of adults, the arrest of the offender, or protective custody for the child.

P. turned 14 in April 2001. She was already five feet 11 inches tall. She lived with her mother, her younger sister, and defendant. Defendant had moved into their two-story Sunnyvale townhouse at the end of 2000. Defendant was born March 5, 1972. When he moved in he was working as a carpenter. He was disabled by a back injury due to a car accident in January 2001. He resumed part-time work in March 2001, the same month that he impregnated Monica. Monica worked two days a week as a registered nurse. When P. came home from school around 3:30 p.m., defendant was home. P. thought of defendant as a father. They engaged in family activities.

Monica asked defendant to move out of her house in early June 2001 because she wanted him to get a job. Defendant continued to visit and occasionally spent the night.

When P.'s menstrual cycle became irregular in April 2001, she told her grandmother she was having a discharge. P. was afraid to tell her mother Monica. Monica was strict and told her she was too young to have sex with boys. Monica regularly asked if she was having sex. P. regularly denied it. P.'s grandmother told Monica. Monica took P. to see the doctor. Defendant accompanied them although he no longer lived with them. On June 29, 2001, a doctor reported that P. was pregnant.

A. Steven Johnson

P. told her mother that the father of her child was a 15-year-old boy named Steven. Her mother wanted to talk to him. P. took her to an apartment complex where he used to live. The manager could not tell P.'s mother who lived there.

At trial in February 2002, P. testified as follows. She had known Steven since the fourth or fifth grade. He lived in East Palo Alto. P. used to walk to Steven's apartment after her mother drove her to the nearby house of a female friend. In early April 2001, P. and Steven were kissing at his apartment. He performed oral sex on her. He moved up as though to kiss her and put his penis inside of her. It was painful. She told him to stop. He did not stop. She tried to push him off. She did not know if he ejaculated. She went to the restroom and cried when she saw blood in her vaginal area. He apologized. She cleaned herself up and left his apartment. She ignored him for a while. Two or three weeks later, after he apologized again, they ended up having sexual intercourse. They had sex one

more time.  In the middle of May 2001, she went to his apartment.  He orally copulated her and tried to force himself on her, saying she was going to "give him some."  She left and did not see him again.

When P.'s mother was unable to locate Steven, she called the police.  On July 5, 2001, Officer Anton came to their residence and talked to P.  P. told Anton about Steven.  At trial P. admitted that she had lied to Anton about Steven forcing himself on her because she did not want her mother to know she was having sex.  P. admitted that she lied about Steven's address and his residence.  She did not want her mother to find out where he really lived.  P. admitted that she had lied to Officer Anton about Steven being on probation in Santa Clara County.  He was really on probation in San Mateo County.

B. Defendant

P. had an abortion a few days after her July 5, 2001 interview with Officer Anton.  On July 10, 2001, Detective Chris Powell of the Sunnyvale Department of Public Safety arranged to talk to P. downstairs at her house while her mother waited upstairs.  Powell and P. talked for about an hour.  The interview was not tape-recorded.  After beginning with general questions, Powell confronted P. with his inability to locate Steven.  Powell said he believed Steven did not exist.  There was no record of him at the high school that P. said he attended or at the apartments where P. said he had lived.  Powell told her that the allegations were serious and that they need to find the person responsible.  P. admitted there was no Steven Johnson.  She named defendant as the father of her child.  P. told Powell about several sexual encounters with defendant underlying the counts described below.

By the end of their interview, P. was crying.  She felt guilty about betraying her pregnant mother by having sex with her mother's boyfriend.  She was concerned about her mother's reaction.  She said defendant was the only person she had sex with.

After this interview, P. agreed to Powell's request to call defendant on the telephone the same day, July 10, 2001, from the police station.  Powell was in the room with P. listening to the call.  The conversation was tape-recorded.  Powell suggested that P. begin the call on the premise that she was feeling bad about the abortion and was thinking about telling her mother.  He also suggested asking why defendant had not used a condom.

P. began the conversation as suggested by Powell.  P. alternated between asking defendant why he had done what he did with her and telling defendant that he was hurting her mother by being cold to her and by seeing another woman named Aisha.  Defendant reacted by saying that P. was "tripping" and "talking crazy."  He said that some of her statements were lies and that she was just trying to "start some shit" that would cause people to get hurt or killed.

During the conversation defendant also acknowledged having a sexual relationship with P.  He said that what happened between them "was our business. What's done is done."  When asked why he did not use a condom, he answered, "Why didn't I? I don't know.  I don't know.  And why didn't you make me?"  When P. said that defendant "came onto" her, he said, "we both came onto each other . . . because

you could have said no." When asked why defendant was trying to make it seem like her fault, he answered, "basically as life it, it's both of our faults. And you not, and you know what I'm saying, as many times as we, and you know what I'm saying, did, did, did whatever, you could have said no." When she claimed she did, he denied it and asked, "You say no all the time?"

Defendant said "that what, what both of us did was wrong. You know what I'm saying and I should know already. You know, 'cause I'm the older one. I should know better." He said he did not stop because he thought she liked it. She kissed him back and told him that she loved him. Later defendant repeated that he was old enough to know better, but said that she was also old enough to know better and to discourage him.

Defendant asked her not to tell anyone and to promise to talk to him in person. He said he loved them all and wanted to move back in with them.

After the telephone conversation, Detective Powell had defendant arrested the same day, July 10, 2001. Powell took defendant to police headquarters. Defendant agreed to talk to Powell after being read his rights. When Powell first told defendant that P. had accused him of sexually molesting her, defendant denied it. He said that P. had just threatened him with such accusations on the telephone because she was upset about his breakup with her mother. Defendant admitted having a sexual relationship with P. after Powell told him that he had listened to and tape-recorded defendant's telephone conversation with P. Defendant said he knew it was wrong because of her age, but he felt that P. was partly responsible because she was a willing participant and she was old enough to make her own choices.

Within a week of defendant's arrest, P. told her devastated mother that it was not defendant. P. wrote defendant a letter of apology. At trial her mother testified that she had to accept whatever P. said.

At trial P. stated that she had fabricated the story about defendant to hurt him because he was hurting her mother. He was hurting her by cheating on her with another woman named Aisha. P. said that she had heard a similar story about someone else and just added in defendant's name.

1.      Counts 1 (aggravated sexual assault) and 4 (lewd touching).

In February 2001, P.'s mother took an overnight trip to Reno. Defendant was the adult in charge of P., her sister, and two of defendant's young nephews. They rented movies and fell asleep on the couch. P. awakened to defendant touching her breasts under her shirt. She was half asleep and thought she was dreaming. Defendant unbuttoned her pants, put his finger in her vagina, and moved it around. She told him to stop. He told her to be quiet. He told her to go upstairs. She initially hesitated and then went along. He did not drag her.

According to Powell, P. said that defendant took her directly to the master bedroom. At trial P. recalled telling Detective Powell that defendant first took her upstairs to her room and tried to push her onto her bed, but his nephew Marcel was sleeping in the bed, so defendant took her into the master bedroom.

In the master bedroom, defendant removed her pants and his pants and pushed her onto the bed. P. tried to resist him and said no, but he put his penis in her vagina

Order Denying Petition for Writ of Habeas Corpus, Denying Requests for Appointment of Counsel, and Granting Certificate of Appealability

P:\PRO-SE\SJ.Rmw\HC.07\Small133habeas.wpd      5

for a couple of minutes. Defendant did not threaten her with physical force or harm. When it was over P. got up and saw blood coming from her vagina. Defendant apologized. He told her not to worry about it and not to tell anybody what they had done.

In P.'s recorded telephone conversation with defendant, she said that she did not "come onto" him the first time. He said that he came up to her and she woke up and sat there. They were in the living room when she grabbed his hand. She denied it. He agreed that they went upstairs. She said that he told her "come on," he grabbed her hand and walked her upstairs. He questioned that he forced her upstairs. "Okay so you not old enough to snatch your hand back then, what you doing. Yes you are. You old enough and you big enough." She said that when they got upstairs, defendant told her he wanted her so bad. He tried to push her onto her bed but Marcel was there. She said no and pushed him back. Defendant said he did not remember that. He said it was "all bad" and "it shouldn't have happened." When asked why he did not stop, he replied, "Did you force me to stop?" She said she told him to stop. He disagreed. She said that he did not rape her, but he forced himself on her.

2.      Counts 2 (aggravated sexual assault) and 5 (lewd touching)

About two weeks after the first incident, defendant and P. were together in their residence. P. was lying on the couch. He approached her and began kissing her. He held her hands over her head and kissed her. He lifted P.'s skirt and orally copulated her. P. tried to move away and told him no. Her told her not to be afraid. As he continued to perform oral sex, she resigned herself to it and had an orgasm.

3.      Counts 3, 6 (lewd touching), and 7 (oral copulation)

P. told Detective Powell that they had sex about ten times between February and July 2001, always in their apartment, sometimes when her mother was home. Four times involved intercourse, the rest involved oral copulation. Defendant did not wear a condom. Once he ejaculated inside her. The other times he ejaculated in his hand. P. was not sure about the specific dates. After the third time she stopped resisting. She thought she was falling in love with defendant.

After Detective Powell confronted defendant with his taped telephone conversation defendant admitted having sex with P. about 15 times. He said they had intercourse about five times. The other times he orally copulated her and digitally penetrated her or she masturbated him. He wore a condom twice and ejaculated into his hand other times.

The prosecutor argued to the jury that count 3 related specifically to the act of sexual intercourse that impregnated P. between March 17 and 23, 2001. Sexual penetration, digital penetration, or fondling of the breasts could qualify for count 6. Count 7 was lewd touching after P turned 14 in April 2001.

3.      Count 8 (lewd touching)

The last time they had sex was on July 2, 2001. P's mother and sister had gone to the dentist. P. was wearing a towel after taking a shower. Defendant grabbed her. She told him no. He told her it would be the last time. He pulled her into the master bedroom and they had intercourse. He ejaculated inside of her.

1    (People v. Small, H024869 (December 30, 2003) (footnote omitted), Ex. C at 2-8.)[1]

2                                    **DISCUSSION**

3    **I.    Standard of Review**

4        This court may entertain a petition for writ of habeas corpus "in behalf of a person

5    in custody pursuant to the judgment of a state court only on the ground that he is in

6    custody in violation of the Constitution or laws or treaties of the United States."  28

7    U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act of 1996

8    ("AEDPA"), a district court may not grant a petition challenging a state conviction or

9    sentence on the basis of a claim that was reviewed on the merits in state court unless the

10   state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or

11   involved an unreasonable application of, clearly established federal law, as determined by

12   the Supreme Court of the United States; or (2) resulted in a decision that was based on an

13   unreasonable determination of the facts in light of the evidence presented in the state

14   court proceeding."  28 U.S.C. § 2254(d).

15       Under 28 U.S.C. § 2254(d)(2), a district court must presume correct any

16   determination of a factual issue made by a state court unless the petitioner rebuts the

17   presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

18   This presumption is not altered by the fact that the finding was made by a state court of

19   appeals, rather than by a state trial court.  *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981);

20   *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2001), *amended*, 253 F.3d 1150 (9th Cir.

21   2001).

22       As to petitioner's first, tenth, eleventh, thirteenth and the actual innocence claims,

23   where the California Supreme Court denied review of petitioner's claims without

24   explanation, the court looks to the last reasoned state court decision in conducting habeas

25   review.  *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079 & n. 2 (9th Cir. 2000) (citation

26   ────────────────────

27       [1]  Unless otherwise noted, all references to "Ex." are to exhibits lodged by respondent in
28   support of his answer.

Order Denying Petition for Writ of Habeas Corpus, Denying Requests for Appointment of Counsel, and Granting Certificate of Appealability

1   omitted), *cert. denied*, 534 U.S. 944 (2001) (the district court "looks through" the

2   unexplained California Supreme Court decision to the last reasoned state court decision).

3   In the instant case, the Superior Court of California for the County of Santa Clara

4   rendered the last reasoned state court decision on petitioner's first, tenth, eleventh,

5   thirteenth and the actual innocence claims.

6       As to petitioner's other claims, the standard of review under the AEDPA is

7   somewhat different where the state court failed to issue a reasoned decision.  In such a

8   case, a review of the record is the only means of deciding whether a state court's decision

9   was objectively reasonable.  *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003);

10  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).  When confronted with such a

11  decision, a federal court should conduct "an independent review of the record" to

12  determine whether the state court's decision was an unreasonable application of clearly

13  established federal law.  *Himes*, 336 F.3d at 853; *Delgado*, 223 F.3d at 982.  The federal

14  court need not otherwise defer to the state court decision under the AEDPA: "A state

15  court's decision on the merits concerning a question of law is, and should be, afforded

16  respect.  If there is no such decision on the merits, however, there is nothing to which to

17  defer."  *Greene v. Lambert*, 288 F.3d 1081, 1089 (9th Cir. 2002).  In sum, "while we are

18  not required to defer to a state court's decision when that court gives us nothing to defer

19  to, we must still focus primarily on Supreme Court cases in deciding whether the state

20  court's resolution of the case constituted an unreasonable application of clearly

21  established federal law."  *Fisher v. Roe*, 263 F.3d 906, 914 (9th Cir. 2001); *abrogated on

22  other grounds*, 537 U.S. 3 (2002).  Therefore, the court will conduct an independent

23  review of the record as to the to claims two, three, four, five, six, seven, eight, nine, and

24  twelve in order to determine if the state court's decision denying habeas relief was

25  objectively reasonable.  *See Himes*, 336 F.3d at 853.

26  **II.   <u>Legal Claims</u>**

27      Petitioner raises the following claims for relief:  (A) there was insufficient

28

1   evidence to support the charges of forcible rape and forcible oral copulation (Claims 2

2   and 3); (B) the trial court's failure to *sua sponte* instruct the jury on the lesser included

3   offenses and the meaning of the terms "force" or "forcible" violated petitioner's due

4   process rights (Claims 4, 5, 6, 7, 8, and 9); (C) trial counsel was ineffective by failing to

5   investigate and present evidence of an alibi defense, failing to file a motion to suppress

6   P.'s statements to police and petitioner's confession, failing to file a motion dismiss the

7   charges against petitioner, failing to challenge the specificity of the charges, and appellate

8   counsel was ineffective by failing to raise the issue of motion to dismiss on appeal

9   (Claims 10, 11, and 12);[2] (D) prosecutor committed a *Brady* violation by failing to turn

10  over a report with the results of the Child Protective Services investigation (Claim 13);

11  and (E) petitioner is actually innocent of the crimes of which he was convicted.[3]  (Am.

12  Pet. at 6-73.)

13          **A.    *Insufficiency of Evidence Claims***

14          In claims 2 and 3, petitioner contends that there was insufficient evidence to

15  support the charges of forcible rape and forcible oral copulation.  (Am. Pet. at 11-25.)

16  Specifically, petitioner contends that there was insufficient evidence of force.  (*Id.* at 16-

17  19.)

18  _____

19      [2]  In his petition, petitioner asserts as a separate and independent claim that the trial court
    violated his due process rights during the preliminary hearing when it found sufficient evidence

20  to require petitioner to stand trial on the charges.  (Claim 1, Am. Pet. at 6.)  However, in his
    traverse, petitioner concedes that there is no constitutional right to a preliminary hearing.  He

21  explains that the nature of his claim is that his counsel was ineffective in failing to file a motion
    pursuant to Cal. Penal Code § 995 to have the charges against him dismissed -- the same claim

22  that he asserts in claim 11.  (Traverse at 2.)  Accordingly, the court will treat claims 1 and 11 as

23  one claim.

24      [3]  Although a claim of actual innocence is not specifically identified in the petition as a
    separate claim for habeas relief, petitioner's supporting papers make clear his intention to assert

25  this claim.  (*See* Am. Pet. at 73.)
        The actual innocence and the *Brady* claims were not identified in the Order to Show

26  Cause issued prior to the case was transferred to the undersigned.  However, petitioner has
    discussed them in detail in his amended petition and respondent has addressed them in his

27  answer.  Accordingly, the claims have been fully briefed.

28

Order Denying Petition for Writ of Habeas Corpus, Denying Requests for Appointment of Counsel, and Granting Certificate of
Appealability

1    On habeas corpus, the court's inquiry into the sufficiency of evidence is limited.

2    The relevant inquiry on review of a constitutional challenge to the sufficiency of the

3    evidence to support a criminal conviction is "whether, after viewing the evidence in the

4    light most favorable to the prosecution, any rational trier of fact could have found the

5    essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443

6    U.S. 307, 319 (1979).  The reviewing court "faced with a record of historical facts that

7    supports conflicting inferences must presume -- even if it does not affirmatively appear on

8    the record -- that the trier of fact resolved any such conflicts in favor of the prosecution,

9    and must defer to that resolution." *Id*. at 326.

10    In light of 28 U.S.C. § 2254(d), a federal habeas court applies the standard of

11    *Jackson* with an additional layer of deference.  *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th

12    Cir. 2005).  A federal habeas court must ask whether the operative state court decision

13    reflected an unreasonable application of *Jackson* to the facts of the case.  *Id*. at 1275.  A

14    writ may be granted only if the state court's application of the *Jackson* standard was

15    "'objectively unreasonable.'"  *Id*. at 1275 n.13.

16    (i)    Evidence with Respect to Forcible Rape Count

17    The jury was instructed that the crime of forcible rape required that sexual

18    intercourse be accomplished "by means of force, violence, duress, menace, or fear of

19    immediate and unlawful bodily injury to the alleged victim."  (Ex. A at 259; Cal. Penal

20    Code § 261(a)(2).)  The jury was not instructed as to the definition of the term "force."

21    Petitioner argues that under *People v. Cicero*, 157 Cal.App.3d 465 (1984), the

22    prosecution's burden of establishing "force" required a showing of physical force

23    substantially different from or substantially greater than that necessary to accomplish the

24    rape itself.  Petitioner claims the prosecution has not met its burden.

25    In *Cicero*, the court considered the meaning of the term "force" as it appeared in

26    section 288, former subdivision (b) (now subdivision (b)(1)) relating to sexual abuse of a

27    child by force.  *Id.* at 474.  The court held, where there has been no physical harm to the

28

Order Denying Petition for Writ of Habeas Corpus, Denying Requests for Appointment of Counsel, and Granting Certificate of Appealability

child, the word "force" as used in section 288, former subdivision (b) requires proof that a

defendant used physical force "substantially different from or substantially greater than

that necessary to accomplish the lewd act itself." *Id.* After *Cicero*, a number of

California cases suggested that the term "force" as it is used in statutes defining sexual

offenses other than violations of section 288, subdivision (b)(1) required proof that the

defendant used physical force substantially different from or substantially greater than the

force inherent in the sexual act itself. *See e.g.*, *People v. Elam*, 91 Cal.App.4th 298, 306

(2001) (assault with intent to commit forcible oral copulation).  However, in *People v.*

*Griffin*, 33 Cal.4th 1015, 1028 (2004), the California Supreme Court clarified that the

*Cicero* standard of proving force did not apply to a rape charge.  In rejecting the *Cicero*

standard with respect to a rape charge, the Supreme Court indicated that "it has long been

recognized that 'in order to establish force within the meaning of section 261, subdivision

(2), the prosecution need only show the defendant used physical force of a degree

sufficient to support a finding that the act of sexual intercourse was against the will of the

[victim].'" *Griffin*, 33 Cal.4th at 1023-1024.  Therefore, the trier of fact in a rape case

need only decide "whether defendant used force to accomplish intercourse with [the

victim] against her will." *Id*. at 1028.[4]

      Accordingly, this court will apply the *Griffin* definition of force to determine

whether there was sufficient evidence of force to support petitioner's conviction of

forcible rape.   The evidence with respect to forcible rape showed the following.  P. made

statements to police that on the night in question, petitioner took her into her room.

Petitioner "tried to push [P.] on the bed but [petitioner's nephew] was on the bed, so he

couldn't push [P.] down and [P.] was pushing him back up and like he pulled [P.] into

[P.'s mom's] bedroom and he was trying to have sex with P." (Ex. B at 125.)  In

addition, during her pre-text conversation with petitioner, P. made statements to petitioner

---

[4]  The Court also rejected the defendant's challenge that the trial court erred by failing to
give a *sua sponte* instruction defining "force" under section 261(a)(2).  *Id.*

that petitioner "grabbed [her] hand and walked [her] upstairs (Ex. A at 166); when they

got upstairs she "said no and [he] said come on [P.], I want you so bad" (*id*.); when they

went to P.'s room, petitioner "tried to push [her] down but [petitioner's nephew] was in

the bed and then [P.] kept pushing [him] up" and "pushing [him] back" (*id*.); P. told

petitioner to "stop" (*id*. at 167); but petitioner "forced [himself] on [P.]" (*id*. at 167-68).

P.'s choice of words -- "push," "pull," "grab," and "force" -- clearly indicate that force

was used.  Furthermore, P. was sixteen years younger than petitioner, and viewed him as

an authority figure.  In fact, petitioner described himself as P.'s "surrogate father" and

P.'s mom testified that P. looked to petitioner "as though he was her father."  (Am. Pet. at

13; Ex. B at 413.)  *See People v. Young*, 190 Cal.App.3d 248, 256 (1987) (recognizing

that "in a child-victim case where the defendant was in a position of authority, evidence

of force or fear which would probably be insufficient in an adult-victim case" may be

sufficient for a child-rape case).  Based on the above facts, the court concludes that there

was sufficient evidence of force to support petitioner's conviction for forcible rape.  *See*

*Griffin*, 33 Cal.4th at 1029 (evidence sufficient to support forcible rape conviction where

victim testified that defendant pinned her arms to floor as he penetrated her with his

penis, and that act of intercourse was against her will); *People v. Mejia*, 155 Cal.App.4th

86, 99-101 (2007) (evidence that defendant entered victim's bedroom without permission,

pulled her legs apart, and painfully penetrated her vagina with his penis, while victim

tried to push him off, sufficed to support forcible rape conviction).

Petitioner argues that there was conflicting evidence that negated P.'s statements.

Specifically, petitioner denied that any force has been used during the pre-text

conversation with P. and during his police confession; P. initially told the police that she

was raped by Steve Johnson, her teenage boyfriend; she identified petitioner only after

police officer brought up his name; P. wrote a letter to petitioner apologizing for making

untrue statements about him and explaining that she did it because she was angry at him;

and finally, P. recanted her statements to the police at trial by saying that she lied about

Order Denying Petition for Writ of Habeas Corpus, Denying Requests for Appointment of Counsel, and Granting Certificate of Appealability

P:\PRO-SE\SJ.Rmw\HC.07\Small133habeas.wpd          12

petitioner because she was angry at him for being unfaithful to her mom.  (Ex. B at 309, 323, 325-26, 359, 390.)  However, the jury heard all this testimony and was free to reject it, which, apparently, it did, as P.'s statements to police and to petitioner during pre-text phone call were the only evidence of force underlying the forcible rape conviction.  In addition, the jury heard expert testimony that in child abuse cases retraction may follow disclosure when there are adverse consequences, such as the reaction of adults and the arrest of the offender.  (*Id*. at 157-58.)  And it heard evidence that two months prior to the trial, P.'s mother bore petitioner's child.  (*Id*. at 414.)  The jury could have inferred that by recanting at trial, P. was trying to protect petitioner as the father of her half-sister. The jury's verdict reflects its judgment that P.'s recanting statements and petitioner's statements during his confession and during the pre-text call were not credible.

In view of P.'s statements to police and during the pre-text phone call, the expert testimony regarding recantation in child abuse cases, and the fact that petitioner was the father of P.'s half-sister, it cannot be said that no rational juror could have found petitioner guilty of forcible rape beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 321.  That the jury chose to believe P.'s earlier statements, rather than her statements at trial, is not a basis for revisiting the jury's determination on federal habeas review.  *See Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir.2004) (" [a] jury's credibility determinations are . . . entitled to near-total deference under *Jackson*" ); *Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review").  After an independent review of the record, the court concludes that the state court's denial of habeas corpus relief did not involve an unreasonable application of the *Jackson* standard.  *See* 28 U.S.C. § 2254(d); *Juan H*., 408 F.3d at 1274.

(ii)    Evidence with Respect to Forcible Oral Copulation Count

The jury was instructed that the crime of forcible oral copulation required that the act of copulating be accomplished "by means of force, violence, duress, menace, or fear

of immediate and unlawful bodily injury to the alleged victim or any other person." (Ex. A at 261; Cal. Penal Code § 288a(c)(2).) The jury was not instructed on the definition of the term "force." Petitioner argues once again that there was insufficient evidence of force as that term is defined in *Cicero*. Again, petitioner's reliance on *Cicero* is misplaced. In *People v. Guido*, 125 Cal.App.4th 566, 576 (2005), the court considered whether the *Cicero* standard of force applied to the forcible oral copulation charge. Analyzing the *Griffin* decision, the court found that there was no reasoned basis to apply a different concept of the term "force" to forcible rape and forcible oral copulation. The court held that the force necessary to prove oral copulation by force is the force sufficient to overcome the victim's will.[5] *Id.*

In this case, the evidence with respect to forcible oral copulation showed the following. P. made statements to police that she tried to resist petitioner but he held her hands over her head, lifted her skirt, and orally copulated her. At some point, she stopped resisting and had an orgasm. (Ex. B at 178-79, 343, 381.) This evidence sufficed to show forcible oral copulation. *See People v. Hesslink*, 167 Cal.App.3d 781, 791 (1985) (victim's testimony that defendant pushed her head towards his penis and that she orally copulated him sufficient to support conviction for forcible oral copulation). Although P. recanted the statements to police at trial, the jury could have reasonably believed that she was truthful when she made the statements to police. Petitioner has not demonstrated that based on the record described above, viewed in the light most favorable to the prosecution, no rational trier of fact could have found petitioner guilty of forcible oral copulation. Accordingly, the court concludes that the denial of habeas corpus relief by the Superior Court was not an unreasonable application of *Jackson*.

## B.    Instructional Error Claims

Petitioner contends that several instructional errors violated his due process rights.

---

[5]  The court also held that the term did not carry a specialized legal definition and the trail court was not required to give the jury a definition of the word "force." *Id.*

1    (Am. Pet. at 26-56.)

2        A challenge to a jury instruction solely as an error under state law does not state a

3    claim cognizable in a federal habeas corpus action. *Estelle v. McGuire*, 502 U.S. 62,

4    71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner

5    must show that the ailing instruction by itself so infected the entire trial that the resulting

6    conviction violated due process. *Id*. at 72. The instruction may not be judged in artificial

7    isolation, but must be considered in the context of the instructions as a whole and the trial

8    record. *Id*. Furthermore, "[a]n omission, or an incomplete instruction, is less likely to be

9    prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155

10   (1977). The "burden is especially heavy" for a habeas petitioner whose claim involves a

11   failure to give a particular instruction. *Id*. If a court finds a constitutional error, it must

12   then determine whether the error had a substantial and injurious effect or influence on the

13   jury's verdict before granting habeas relief. *Calderon v. Coleman*, 525 U.S. 141, 146

14   (1998) (per curiam) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

                        (i)    Duty to Define the Terms "Force" or "Forcible"

15

16       In claims 4 and 5, petitioner contends that the trial court had a duty to *sua sponte*

17   instruct the jury on the meaning of the term "force" or "forcible." A special definition is

18   needed for words and phrases in statutes if they are outside the common understanding of

19   jurors, technical, or ambiguous. *U.S. v. Hernandez-Escarsega*, 886 F.2d 1560, 1571-72

20   (9th Cir. 1989). As noted above, the term "force" as it is used in rape and oral copulation

21   statutes does not need to be defined because it is a commonly understood term. *See supra*

22   at 11, n.4 & 14, n.5; *Griffin*, 33 Cal.4th at 1022-23, 1028 (finding that the meaning of

23   "force," as used in the rape statute, is commonly understood and that the trial court

24   therefore had no duty to specially define it); *Guido*, 125 Cal.App.4th at 576 (same with

25   respect to oral copulation statute). Because petitioner has failed to make out even a

26   violation of state law, he necessarily fails to establish any federal constitutional violation.

27   ///

28

1

(ii)     Duty to Instruct That the Jury Could Only Convict of the Less
Serious of Two Offenses

2

3     In claims 6, 7, and 8, petitioner contends that the trial court should have instructed

4  the jury that counts 4 and 5 which charged lewd touching of a minor were alternative

5  charges to counts 1 and 3 which charged forcible rape and forcible oral copulation, and

6  that the jury could not convict petitioner of both alternatives.

7     The Double Jeopardy Clause of the Fifth Amendment guarantees that no person

8  shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S.

9  Const. amend. V.  It precludes a defendant from being convicted of both a greater- and a

10  lesser-included offense predicated on the same act. *Rutledge v. United States*, 517 U.S.

11  292, 297 (1996).

12     "Under California law, a lesser offense is necessarily included in a greater offense

13  if either the statutory elements of the greater offense, or the facts actually alleged in the

14  accusatory pleading, include all the elements of the lesser offense, such that the greater

15  cannot be committed without also committing the lesser." *People v. Birks*, 19 Cal.4th

16  108, 117-118 (1998).  That is, if a crime cannot be committed without also necessarily

17  committing a lesser offense, the latter is a lesser-included offense within the former.

18  Applying this definition to lewd touching, it is obvious that lewd touching is not a lesser-

19  included offense of rape and oral copulation.  Unlike rape and oral copulation which are

20  general intent crimes, lewd touching of a minor is defined as a specific intent crime;

21  accordingly, it carries an additional element to be proved.  Thus, rape and oral copulation

22  can be committed without also committing lewd touching. *See People v. Griffin*, 46

23  Cal.3d 1011, 1030 (1988) ("a lewd act on a child is not a necessarily included offense of

24  either rape or sodomy"); *People v. Benavides*, 35 Cal.4th 69, 97 (2005) (because lewd

25  conduct with a child is not a necessarily included in the offense of rape, a conviction for

26  lewd conduct with a child can be obtained at trial and upheld on appeal by the same

27  evidence used to show the defendant raped the child); *People v. Warner*, 39 Cal.4th 548,

28

1   557 (2006) (oral copulation is a general intent crime containing no "sexual gratification"

2   specific intent element).  Thus, the trial court did not err in failing to instruct the jury that

3   it could only convict petitioner of lewd touching or rape and oral copulation, but not of all

4   three offenses.   Because petitioner has failed to make out even a violation of state law, he

5   necessarily fails to establish any federal constitutional violation.

6                     (iii)    Duty to Instruct the Jury on Lesser-Included Offenses

7           In claim 9, petitioner contends that the trial court had a *sua sponte* duty to instruct

8   the jury on lesser-included offenses.

9           In non-capital cases, such as this one, "the failure of a state trial court to instruct on

10  lesser included offenses . . . does not present a federal constitutional question." *Solis v.*

11  *Garcia*, 219 F.3d 922, 929 (9th Cir. 2000) (*quoting Windham v. Merkle*, 163 F.3d 1092,

12  1106 (9th Cir. 1998)); *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984).  Because

13  petitioner's is a noncapital case, this court has no authority to grant relief on petitioner's

14  claim that the trial court erred in failing to instruct on lesser-included offenses.

15          Accordingly, the court concludes that the denial of habeas corpus relief by the

16  Superior Court was not objectively unreasonable.

17          *C.      Ineffective Assistance of Counsel Claims*

18          Petitioner claims that his trial and appellate counsel were ineffective based on a

19  variety of grounds.  (Am. Pet. at 57-70.)

20          Effective assistance of trial counsel is a right guaranteed by the Sixth Amendment.

21  *Strickland v. Washington*, 466 U.S. 688, 686 (1984).  Claims that assistance of counsel

22  was ineffective are evaluated in terms of whether counsel's conduct so undermined the

23  proper functioning of the adversarial process that the trial cannot be relied upon as having

24  produced a just result.  *Id*.

25          In order to prevail on a Sixth Amendment ineffectiveness of counsel claim,

26  petitioner must establish both that his counsel's performance was deficient and that he

27  was prejudiced by that deficiency.  *Id*. at 687-88, 694.  Deficient performance is that

28

1  which falls below an "objective standard of reasonableness" under prevailing professional

2  norms. *Id*. at 687-88. Prejudice in this context is a "reasonable probability that, but for

3  counsel's unprofessional errors, the result of the proceeding would have been different."

4  *Id*. at 694.

5      Where petitioner asserts that his counsel should have made a particular motion,

6  prejudice is only established if a petitioner can show a reasonable likelihood both that the

7  motion would have been granted and that the outcome of the trial itself would have been

8  different as a result. *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999).

9           (i)      Failure to Present an Alibi Defense

10      Petitioner contends that his trial counsel was ineffective by failing to investigate

11  and present evidence of an alibi defense. (Am. Pet. at 58.) Specifically, petitioner claims

12  that prior to trial, he provided his counsel with a list of names and contact information for

13  potential alibi witnesses and requested his counsel to contact and interview them.

14  However, the counsel has failed to do it. In support of his claim, petitioner attaches

15  declarations from these witnesses (Patricia Johnson, Susan Johnson, and Veronica

16  English). The witnesses declare that petitioner lived in their residences during the

17  relevant period -- from February 2001 until petitioner's arrest. (*Id*., Ex. C, D & E.) The

18  state court found that the "declarations from 'alibi witnesses' fail[ed] to establish any

19  kind of credible alibi defense." (*Id*., Ex. I.)

20      *Strickland* imposes upon counsel a duty to make a reasonable investigation.

21  *Strickland*, 466 U.S. at 691. Counsel has a duty to investigate defendant's "most

22  important defense." *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir.), *amended*, 253 F.3d

23  1150 (9th Cir. 2001) (citation and quotations omitted). However, the duty to investigate

24  and prepare a defense "does not necessarily require that every conceivable witness be

25  interviewed." *Id*. (citation and internal quotations omitted). "[R]easonably diligent

26  attorneys may draw a line when they have good reason to think further investigation

27  would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005) (citations omitted).

28

1    A defense of alibi would have been unavailing.  Petitioner confessed that he had

2    sex with P. and made statements to that effect during the pre-text phone call with P.  In

3    addition, P. made statements to police and P.'s mother testified at trial that petitioner

4    shared the apartment with her and her daughters until she kicked him out in June 2001.

5    (Ex. B at 414.)  Moreover, neither petitioner nor the "alibi" witnesses claim that petitioner

6    never spent any time in the apartment of P. and her mother.  Accordingly, testimony that

7    petitioner resided elsewhere during the charged period would not have been inconsistent

8    with P.'s statements about sexual acts performed by petitioner.  Therefore, counsel's

9    failure to interview these witnesses did not constitute deficient performance.

10                    (ii)    Failure to Have Evidence Suppressed

11    Petitioner contends that trial counsel was ineffective by failing to file a motion to

12    suppress evidence.  (Am. Pet. at 61.)  In his traverse, petitioner elaborates that his counsel

13    was ineffective for not suppressing P.'s statements to police and petitioner's confession.

14    (Traverse at 3.)

15    First, petitioner is mistaken that counsel never filed a motion to suppress.  Counsel

16    did move to suppress petitioner's statements during his confession on the ground that they

17    were obtained in violation of *Miranda*.  (Ex. B at 43-56.)  Counsel vigorously cross-

18    examined the police officer to whom petitioner confessed and presented several

19    arguments why the statements should be excluded.  Nevertheless, the court denied the

20    motion.  (*Id*. at 56-57.)  Petitioner does not explain what more counsel could have done

21    and which additional bases for suppression counsel could have presented.

22    Second, with respect to P.'s statements to police, petitioner does not offer any

23    grounds upon which a motion to suppress could have been filed or any basis to conclude

24    that such a motion, had it been filed, would have been meritorious.  Thus, counsel's

25    motion to suppress petitioner's confession and counsel's failure to move to suppress P.'s

26    statements did not constitute deficient performance.

27    ///

28

(iii)   <u>Failure to Have Charges against Petitioner Dismissed or Challenged on Specificity Grounds</u>

Petitioner contends that his trial counsel was ineffective by failing to file a motion to dismiss charges against him and challenge them for lack of specificity.  (Am. Pet. at 62-63.)  Petitioner argues that the only evidence that prosecution produced at the preliminary hearing was the testimony of Lieutenant Powell who testified regarding out-of-court statements that P. and petitioner made to him.  Petitioner alleges that the testimony was insufficient to hold him to answer for charges and that it was not specific enough.  (*Id.*)

To hold a defendant to answer for charges the state must prove probable cause. Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of guilt of the accused.  *Jackson v. Superior Court*, 62 Cal.2d 521, 525 (1965).  An information will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.  *People v. Crosby*, 58 Cal.2d 713, 719 (1962).  Under Cal. Penal Code § 872, "the finding of probable cause may be based in whole or in part upon the sworn testimony of a law enforcement officer . . . relating the statements of declarants made out of court offered for the truth of the matter asserted."

A review of the transcript of the preliminary hearing reveals that there was ample evidence to meet the low probable cause standard under California law.  Furthermore, the court could rely on the testimony of Lieutenant Powell regarding out-of-court statements made by P. and petitioner for the truth of the matter asserted.   Lieutenant Powell's testimony informed defendant of the nature of the charges and the approximate time and place of commission.  Thus, counsel's failure to move to dismiss the charges or challenge them for lack of specificity did not constitute deficient performance.

///

///

Order Denying Petition for Writ of Habeas Corpus, Denying Requests for Appointment of Counsel, and Granting Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.07\Small133habeas.wpd          20

1              (iv)    Failure to Raise the Issue of Motion to Dismiss on Appeal

2          Petitioner contends that he received ineffective assistance on appeal because his

3   appellate counsel failed to argue that his trial counsel should have filed a motion to

4   dismiss the charges.  (Am. Pet. at 61.)

5          Claims of ineffective assistance of appellate counsel are also reviewed according

6   to the *Strickland* standard.  *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir.1989).  As

7   discussed above, petitioner's trial counsel was not ineffective.  Appellate counsel

8   reasonably could have concluded as much.  Therefore, petitioner has not shown any

9   deficient performance by appellate counsel or resulting prejudice.  *See Featherstone v.*

10  *Estelle*, 948 F.2d 1497, 1507 (9th Cir. 1991) (where trial counsel's performance did not

11  fall below the *Strickland* standard, "petitioner was not prejudiced by appellate counsel's

12  decision not to raise issues that had no merit") (footnote omitted); *see also Miller*, 882

13  F.2d at 1434 & n.11 (counsel must weed out weak claims).

14         Accordingly, the court concludes that the state court's denial of habeas relief was

15  not contrary to or an unreasonable application of *Strickland*.

16         **D.    Brady Violation Claim**

17         Petitioner contends that the prosecutor failed to turn over evidence that was

18  favorable to petitioner, specifically, a report of the Child Protective Services ("CPS")

19  investigation results.  (Am. Pet. at 71.)  Petitioner claims that the CPS investigation

20  concluded that petitioner did not sexually abuse P.[6]  (*Id.*)  The state court rejected this

21  claim because petitioner failed to attach the CPS investigation report.  (Ex. K.)

22         "[T]he suppression by the prosecution of evidence favorable to an accused upon

23  request violates due process where the evidence is material either to guilt or to

24  punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v.*

25

26

27         [6] Petitioner cites to declarations by P. and her mother in support of his claim.  (*Id.*, Exs.
    A & B.)  However, P.'s declaration is silent as to the CPS investigation and its results.  The
28  mother's declaration but does reference the investigation, but is silent as to its results.

*Maryland*, 373 U.S. 83, 87 (1963).  The duty to disclose such evidence applies even when there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985).  Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *Id*. at 682.  "There are three components of a true *Brady* violation:  [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Petitioner has not made any credible showing that a CPS investigation report existed or that it included exculpatory or impeachment material.  Even if it did, there is no evidence that prosecutor requested, possessed, knew of, and controlled the CPS documents.  Therefore, it is unclear whether the prosecutor had any duty to disclose these documents.  Accordingly, the court concludes that the state court's decision was not contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court.

### E.  *Actual Innocence Claim*

Petitioner contends that the new evidence attached to his petition shows that he is actually innocent and that a miscarriage of justice will result absent federal review.  (Am. Pet. at 73.)  Petitioner relies on declarations by P. and P.'s mother.  P. declares that she made the statements to police implicating petitioner because the officer threatened her that if she did not "conform to [his] expectations," she would be taken from her mother and placed in foster care.  (*Id*., Ex. A.)  P.'s mother declares that neither she nor petitioner's mother consented to the recording of the pre-text conversation between P. and petitioner.  (*Id*., Ex. B.)  The state court found that there was "nothing 'new' about the

1  declarations provided by the victim or her mother that was not already presented at trial."

2  (*Id.*, Ex. I.)

3         This court agrees.  None of this evidence is new or indicates that petitioner is

4  actually innocent of the charges.  In addition, "[c]laims of actual innocence based on

5  newly discovered evidence have never been held to state a ground for federal habeas

6  relief absent an independent constitutional violation occurring in the underlying state

7  criminal proceeding."  *Herrera v. Collins*, 506 U.S. 390, 400 (1993).  After *Herrera*,

8  courts generally have found that there can be no habeas relief based solely on a

9  petitioner's actual innocence of the crime.  *See Coley v. Gonzalez*, 55 F.3d 1385, 1387

10  (9th Cir. 1995); *Swan v. Peterson*, 6 F.3d 1373, 1384 (9th Cir. 1993).  Accordingly,

11  petitioner's actual innocence claim fails as well.

12  **III.   Requests for Appointment of Counsel**

13         On August 26 and October 14, 2008, petitioner wrote two letters to the court

14  requesting appointment of counsel.  (Docket Nos. 17 & 18.)  Petitioner has requested

15  appointment of counsel on two previous occasions, which the court denied without

16  prejudice.  (Docket No. 15.)

17         The Sixth Amendment's right to counsel does not apply in habeas corpus actions.

18  *Knaubert v. Goldsmith*, 791 F.2d 722, 728 (9th Cir. 1986).  However, 18 U.S.C. §

19  3006A(a)(2)(B) authorizes a district court to appoint counsel to represent a habeas

20  petitioner whenever "the court determines that the interests of justice so require" and such

21  person is financially unable to obtain representation.  The courts have made appointment

22  of counsel the exception rather than the rule.  *See generally* 1 J. Liebman & R. Hertz,

23  Federal Habeas Corpus Practice and Procedure § 12.3b at 383-86 (2d ed. 1994).  In the

24  instant case, the court finds that the interests of justice do not require such appointment.

25  Accordingly, petitioner's requests are DENIED.

26  **IV.   Certificate of Appealability**

27         The district court should grant an application for a certificate of appealability only

28

1  if the petitioner makes a "substantial showing of the denial of a constitutional right." 28

2  U.S.C. § 2253(c)(3).  To obtain a certificate of appealability under 28 U.S.C. § 2253(c), a

3  habeas petitioner must make a showing that reasonable jurists could debate whether, or

4  agree that, the petition should have been resolved in a different manner or that the issues

5  presented were adequate to deserve encouragement to proceed further. *Slack v.*

6  *McDaniel*, 529 U.S. 473 (2000) (*quoting Barefoot v. Estelle*, 463 U.S. 880, 893 n.4

7  (1983)).

8       In the event that petitioner appeals the denial of his habeas corpus petition to the

9  Ninth Circuit Court of Appeals, the court has determined that a certificate of appealability

10  should be granted.  The court has reviewed all of the claims on the merits. While the court

11  has denied the petition for writ of habeas corpus, reasonable jurists could debate whether,

12  or agree that, the petition should have been resolved in a different manner or that the

13  issues presented were adequate to deserve encouragement to proceed further.

14  Accordingly, a certificate of appealability should be granted on the following claims:

15  whether there was sufficient evidence to support the charges of forcible rape and forcible

16  oral copulation (Claims 2 and 3).

17                                    **CONCLUSION**

18       The petition for writ of habeas corpus is DENIED.  Petitioner's requests for

19  appointment of counsel are DENIED.  A certificate of appealability is GRANTED on the

20  issues set forth above.

21       IT IS SO ORDERED.

22

23  DATED:   10/13/09

24                                    *Ronald M Whyte*
                                      _____
                                      RONALD M. WHYTE
                                      United States District Judge

25

26

27

28

Order Denying Petition for Writ of Habeas Corpus, Denying Requests for Appointment of Counsel, and Granting Certificate of
Appealability